UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

THE UNITED STATES OF AMERICA

                                                  **Hon. Hugh B. Scott**
                                                    04CR163A

                v.

                                                         **Report**
                                                           **&**
                                                **Recommendation**

David N. Seeloff,

                                  Defendant.

      Before the Court is the defendant's omnibus motion seeking the following relief: discovery; suppression of all statements made by the defendant; suppression of all evidence seized from defendant's residence; Bill of Particulars; Impeachment/Jencks  Information; Brady Material; expert disclosure; and preservation of notes.[1]

### Background

      At all times relevant to this case, it appears that the defendant,  David N. Seeloff ("Seeloff"), has been under supervision as a military parolee serving a term of parole until 2076 based upon a previous conviction of pre-meditated murder. (Docket No. 24 at page 1-2). Seeloff's actual supervision has been performed by the United States Probation Office ("USPO").   At some time prior to November 18, 2003, USPO Officer Monica Stepney ("Stepney"), received information that the defendant was in possession of firearms and that one

---

[1]    The discovery issues are the subject of a separate Decision & Order.

of them was possibly an illegally altered or shortened shotgun.  Based upon this information, the

USPO requested permission from the U.S. Military Parole Commission ("USMPC"). This

request was granted. The USMPC issued a letter authorizing a search of Seeloff's residence,

vehicle, property and person (Hearing Exhibit 1).  The USMPC also drafted a Modification of

Parole Agreement which was to advise Seeloff that his probation officer has reason to believe

that he was in possession of firearms, that this is a possible violation of the original terms of his

parole, and that the USMPC modified his parole agreement to allow a search.  The Modification

of Parole Agreement also advised Seeloff that his refusal to agree to the search "may require

suspension of his parole and initiation of a preliminary interview to determine whether a

revocation hearing is necessary."  Hearing Exhibit 2).

On or about November 18, 2003, members of the USPO, assisted by members of the

Federal Bureau of Investigation ("FBI"), conducted a search of Seeloff's residence at 3850

German Road, Ransomville, New York.  Prior to commencing the search, the agents presented

Seeloff with a copy of the Modification of Parole Agreement.  After reading the document,

Seeloff signed the agreement reflecting his acceptance of the modification to allow the search.

(Hearing Exhibit 2).

During the search, agents discovered a Western Field, model M15D, .410 gauge shotgun

that had been illegally shortened. Several other guns were also discovered, including a Mossberg,

model 390-K, 16 gauge shotgun; a Savage, model 340C, 30-30 caliber rifle; and an Ithaca, model

37, 16 gauge shotgun were also found.

The defendant asserts that the search of his residence was illegal because it was not based

upon probable cause. Seeloff also argues that his statements to the FBI must be suppressed

because they were made subsequent to his arrest, but prior to him being advised of his rights.

## Discussion

**The Search**

Seeloff contends that the search of his residence was illegal because it was not based upon probable cause.  The defendant contends that the search by the USPO was an impermissible "stalking horse" for a criminal investigation.  In support of this proposition, the defendant cites to several cases from the Ninth Circuit Court of Appeals which recognizes this defense.

The government asserts that Seeloff consented to the search when he signed the Modification of Parole Agreement. The Court agrees. The document signed by Seeloff states that he was agreeing to modification to allow the search.  The defendant has articulated no basis to invalidate his consent to the search.  The fact that Seeloff was advised that his failure to consent to the search might require suspension of his parole status does not invalidate his consent.

The defendant's "stalking horse" defense must also fail. In United States  v. Newton,369 F.3d 659, 667 (2d. Cir. 2004), the Second Circuit made it clear that the "stalking horse" defense is "largely foreclosed by [the Court's] decision in United States v. Reyes, 283 F.3d 446, 462-65 (2d. Cir. 2002), which specifically rejected stalking horse challenges to warrantless searches by probation or parole officers accompanied by the police."  In Reyes, the Second Circuit reviewed

the role of a USPO officer,[2]  the reasonable expectation of privacy of a parolee, [3] and concluded

that "the probable cause requirements of the Fourth Amendment, which apply to a regular law

enforcement officer executing a search warrant for an individual's home, simply do not apply to

visits by probation officers to the homes of convicted persons serving a term of supervised

release."  Reyes, 283 F.3d at 462.  The Court reaffirmed that a parole officer can act in concert

with a police officer in conducting a search of a parolee's home without violating Fourth

---

[2]   [F]ederal probation officers have ... two basic duties: to conduct pre-sentence
investigations and to supervise federal offenders. ...  In fulfilling these obligations, the federal
probation officer works at the cross-section of social work, law enforcement, and penology. The
probation officer assumes "a threefold responsibility: (1) to assist the offender in the
rehabilitation process; (2) to protect the public from persons whose release proves threatening to
the community; and (3) to provide information and recommendations to the court or parole board
so that it may make appropriate decisions regarding continued freedom for the individual
released." ...  Federal probation officers "are responsible for the supervision of all persons
conditionally released to the community by the courts, the Parole Commission, Federal Bureau of
Prisons, and military authorities. Their supervision mission is *to execute the sentence,* control
risk, and promote law-abiding behavior." ... Indeed, supervised release, ...  is imposed by a
federal district court "as *part of a total sentence in addition to* a period of incarceration at the
time of the initial sentencing of a convicted federal criminal defendant." ...  Thus, supervised
release is an integral part of the original sentence imposed pursuant to court order and executed
by the federal probation officer. ...  During the term of supervision, the probation officer is
charged with identifying supervision issues and planning an intervention strategy to address those
issues with the offender. These strategies run the gamut from arranging referrals for substance
abuse treatment to field contacts. ... Probation officers are to give "[h]ighest priority ... to those
issues which, if not addressed, will most likely jeopardize the community."...  A "probation
officer, dissatisfied with the offender's progress, but not sufficiently so to initiate revocation
proceedings, may seek to modify conditions to make them more specific or demanding." ... As
"represent[atives of] the public interest," probation and parole officers are "often the most
appropriate" persons to bring to the attention of the court or the parole board an offender's
conduct that is threatening to the public. ...  To further the role of the probation officer as
community protector, a probation officer is empowered to arrest a probationer or a convicted
person serving a term of supervised release, with or without a warrant, "[i]f there is probable
cause to believe that [the offender] has violated a condition of his probation or release."  Reyes,
283 F.3d at 455-457 (citations omitted).

[3]   "We have held that among '[t]he rights diminished by *parolee* status [are] Fourth
Amendment protections."Reyes, 283 F.3d at 458 (citations omitted)..

Amendment considerations as long as the search is in some way related to the duties of the parole

officer. Reyes, 283 F.3d. at 464.

In this instant case, the record reflects that the search of Seeloff's home was initiated by

the USPO, not by the FBI, and that the search was directly related to the duties of the USPO

officer in supervising Seeloff's compliance with his terms of release.

The motion to suppress the evidence obtained as a result of the search should be denied.

**The Defendant's Statements**

The government acknowledges the bulk of the statements made by Seeloff were

subsequent to his arrest, but prior to being advised of his rights.  Thus, the government agrees

that all but one statement made by Seeloff must be suppressed.

FBI Special Agent John Urbly testified at the suppression hearing.  He testified that he

was aware that Seeloff's possession of the weapon would constitute a violation of his parole

condition.  Special Agent Urbly testified that he found the .410 shotgun in the barn.  Urbly stated

that he went to the house and asked Seeloff what type of weapon he had in the barn.  In response,

Seeloff stated  "a .410 shotgun."  The record reflects that at the time this exchange Seeloff had

been placed in "soft restraints" and "detained" pending the search.  The government admits that

Seeloff had not been advised of his rights at the time of the exchange. However, the government

asserts that Seeloff was not under arrest when he made this statement.  The government also

contends that the question was "asked solely for the purpose of officer safety and in order to

assist the Agent in determining whether the weapon was safe or enabling him to render it in a

safe condition."  (Docket No. 24 at page 7).

Warning requirements under Miranda v. Arizona, 384 U.S. 436 (1966) apply only to "custodial interrogation." Miranda, 384 U.S. at 444; United States v. Newton, 369 F.3d 659, 669 (2d cir 2004). In Newton, the Second Circuit address the standard to be employed in the determination of whether an individual who was "detained" pursuant to a lawful search but not "formally arrested"  is in "custody" for purposes of Miranda.[4]  The Second Circuit held that a District Court could look to both the free-to-leave test and the coercive-pressures test to identify whether circumstances required the presentation of Miranda warnings.  The Court stated, "the free-to-leave inquiry constitutes a necessary, but not determinative, first step in establishing Miranda custody.  The 'ultimate inquiry' for determining Miranda custody, however, is that articulated by the Supreme Court in California v. Beheler: 'whether there is a formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest.'" Newton, 369 F.3d. at 670 citing Beheler, 463 U.S. 1121, 1125 (983) (per curiam) (quoting Oregon v. Mathiason, 429 U.S. 492, 495 (1977)); accord Stansbury v. California, 511 U.S. 318, 324 (1994).

In this respect, the Second Circuit focuses the inquiry on "whether a reasonable person in defendant's position would have understood himself to be subjected to the restraints comparable to those associated with a formal arrest. Newton, 369 F.3d at 673.   The facts in Newton are similar to those present in the instant case.   In that case, parole officers, along with police officers, searched the residence of Newton, a parolee, based upon information that he possessed a gun and had threatened to kill his mother.  Upon entering his residence, the officers placed

---

[4]   Newton citing  Michigan v. Summers, 452 U.S. 692 (1981)(holding that persons at the site of a lawful search may be detained without probable cause until the search is concluded).

Newton in handcuffs.  They then asked him where the gun was located.  Newton advised the officers as to the location of the gun.  Thus, the Court in <u>Newton</u> was faced with the questions similar to those present in this case: (1) was Newton in custody for Miranda purposes; and (2) should his statement advising as to the location of the gun be suppressed.

In applying the standard discussed above, the Court recognized that "handcuffs are generally recognized as a hallmark of a formal arrest" (<u>Newton,</u> 369 F.3d at 676) and found that "a reasonable person would have understood that his interrogation was being conducted pursuant to arrest-like restraints." <u>Newton</u>, 369 F.3d. at 677.  For reasons similar to those set out in Newton, the record in this case reflects that a reasonable person in Seeloff's position would have understood that any questions put to him by the USPO and FBI officers conducting the search were pursuant to arrest-like constraints.  Thus, the Court finds that Seeloff was in custody at the time he was asked to identify what type of gun was located in the barn.

In <u>Newton</u>, however, the Court held that he statement need not be suppressed because it fell within the "public safety" exception to the <u>Miranda</u> requirement. In this regard, "<u>Miranda</u> warnings need not precede 'questions reasonably prompted by a concern for the public safety' or for the safety of the arresting officers' for a suspect's answers to be admitted as evidence of his guilt." <u>Newton,</u> 369 F.3d at 677.  The Second Circuit found that, under the circumstances present in that case, locating the gun was reasonably prompted by a concern for public safety.  Thus, Newton's response to the question as to the location of the gun was admissible.

In the instant case, the record does not reflect the exigent safety concerns present in <u>Newton</u>.  Here, the officers had already located the .410 shotgun in the barn and were in a position to secure the weapon without further information from Seeloff at the time Special Agent

Urbly asked Seeloff to identify the weapon.  Seeloff was already in restraints.  Although Urbly

testified, in conclusory manner, that they needed to know the specific identity of the weapon so

that they could render the weapon safe, this testimony was not supported otherwise in the record.

As a general matter, law enforcement officers are well-trained in how to render weapons safe.

The Court is not persuaded that the weapon could not have been rendered safe without obtaining

incriminating information from Seeloff.  The government has not articulated any basis to find

that the question was reasonably related to a public safety concern at the time it was posed.

Based on the above, it is recommended that the defendant's statement "a .410 shotgun"

should be suppressed.


### Conclusion

Based on the above, it is recommended that the motion to suppress the evidence obtained

as a result of the search of 3850 German Road be DENIED; but that the motion to suppress the

custodial pre-Miranda statement identifying the weapon as "a .410 shotgun" be GRANTED.

Pursuant to 28 USC §636(b)(1), it is hereby ordered that this Report & Recommendation

be filed with the Clerk of the Court and that the Clerk shall send a copy of the Report &

Recommendation to all parties.

**ANY OBJECTIONS to this Report & Recommendation must be filed with the Clerk**

**of this Court within ten(10) days after receipt of a copy of this Report & Recommendation**

**in accordance with 28 U.S.C. §636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of**

**Civil Procedure, as well as WDNY Local Rule 72(a)(3).**

**FAILURE TO FILE OBJECTIONS TO THIS REPORT & RECOMMENDATION WITHIN THE SPECIFIED TIME,  OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WAIVES THE RIGHT TO APPEAL ANY SUBSEQUENT ORDER BY THE DISTRICT COURT ADOPTING THE RECOMMENDATIONS CONTAINED HEREIN.**  Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed2d 435 (1985); F.D.I.C. v. Hillcrest Associates, 66 F.3d 566 (2d. Cir. 1995); Wesolak v. Canadair Ltd., 838 F.2d 55 (2d Cir. 1988); see also 28 U.S.C. §636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and WDNY Local Rule 72(a)(3).

Please also note that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/or evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance.  See Patterson-Leitch Co. Inc. v. Massachusetts Municipal Wholesale Electric Co., 840 F.2d 985 (1st Cir. 1988).

Finally, the parties are reminded that, pursuant to WDNY Local Rule 72.3(a)(3), "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority."  **Failure to comply with the provisions of Rule 72.3(a)(3)may result in the District Court's refusal to consider the objection.**

So Ordered.

s/ Hon. Hugh B. Scott
United States Magistrate Judge

May 26, 2005
Buffalo, New York

9